UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

N⁰ 09-CV-5543 (JFB)

---

BRIAN AHERN,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

Defendant.

---

**MEMORANDUM AND ORDER**
March 24, 2011

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Brian Ahern (hereinafter "plaintiff") brings this action, pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of defendant Commissioner of the Social Security Administration (hereinafter "Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB"). The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes defendant's motion and cross-moves for judgment on the pleadings, alleging that the Administrative Law Judge ("ALJ") did not consider substantial evidence demonstrating plaintiff was disabled and failed to properly evaluate evidence of plaintiff's daily activities. For the reasons that follow, defendant's motion is granted and plaintiff's motion is denied.

I. BACKGROUND

A. Facts

Plaintiff alleges that he became disabled on December 1, 2003 as a result of medical conditions including a coronary artery bypass surgery ("bypass surgery"), insertion of an Implantable Caridioverter Defibrillator ("ICD" or "defibrillator") and a pacemaker, as well as general heart damage. (Administrative Record ("AR") at 76, 135, 193, 195.) ALJ Jay L. Cohen construed plaintiff's complaint as asserting an onset date of April 21, 2007 based on the *res judicata* effect of a previous decision by ALJ Michael London dated April 20, 2007 that was not appealed by plaintiff.[1] *See infra* Section I.B and II.C.1. The following summary of facts is based upon the

---

1. The Court notes that plaintiff does not challenge the ALJ's decision to consider April 21, 2007 as the onset date proposed by plaintiff.

administrative record as developed by the ALJ to assess plaintiff's physical state. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

## 1. Vocational and Other Evidence

Plaintiff was born on August 14, 1963. (AR at 83.) Plaintiff resides with his father. (*Id*. at 36.) He attended college for two years and has had no vocational training. (*Id*.) Plaintiff is unemployed. He worked as a distribution clerk for the Postal Service for sixteen years until 2003, when he stopped working after having the bypass surgery. (*Id*. at 36, 38.) As a distribution clerk, plaintiff sorted mail, distributed mail, unloaded trucks and provided window service at a postal office. (*Id*. at 37.) Plaintiff stated that he has been taking care of his father, who also had a bypass surgery. This included dressing his father and cooking him small meals. (*Id*. at 40.) Although plaintiff did not clean his house, he testified to going shopping once a week and driving once a week. (*Id*. at 41.) Plaintiff's other daily activities included watching TV, reading books, occasionally visiting friends and relatives, and taking the train to see counsel. (*Id*.)

## 2. Medical Evidence

Below, the Court outlines medical evidence of plaintiff's well-being in the period immediately prior to the proposed onset date of April 21, 2007 up until the date of the ALJ's decision.

### a. Treating Physicians

#### i. Dr. Jerald Cohen

Dr. Jerald Cohen, M.D., Director of Echocardiography at Winthrop Cardiology Associates P.C., is plaintiff's cardiologist. (*Id*. at 39.) In his March 6, 2007 letter to another physician, Dr. Cohen noted that plaintiff "today is asymptomatic. He denies chest pain, shortness of breath, palpitations, edema, or syncope." (*Id*. at 231.) Plaintiff's extremities did not exhibit edema, he had a regular rate and rhythm of the heart, his chest was clear and he did not have neck vein distension. (*Id*.) Dr. Cohen compared plaintiff's ejection fraction, or the ability of the heart to pump blood, from 2003 and 2005. At the time of his bypass surgery in 2003, plaintiff's ejection fraction was twenty percent but it improved to fifty-five or sixty percent by 2005. (*Id*.)

In an out-patient clinic progress note dated May 22, 2007, Dr. Cohen stated that plaintiff "was doing well; walked 1.5 miles daily and had no chest pains or shortness of breath. Physical exam claimant was overweight. No murmurs, gallops or rubs; no claudication clubbing or edema." (*Id*. at 197 (content of note described by Dr. Wells[2]).)

---

2. Plaintiff points out that Dr. Wells must be referring to the May 22, 2007 letter by Dr. Juang, not Dr. Cohen, and that in the letter Dr. Juang indicated plaintiff was only walking one and a half miles on Mondays and Fridays, not daily. (Pl.'s Cross-Mot. Mem. of Law at 7, n.2.) Even if plaintiff is right, that does not alter the Court's conclusion that the ALJ's determination that plaintiff was not disabled is based on substantial evidence.

2

ii. Dr. George Juang

Dr. George Juang, M.D., F.A.C.C., who was the Director of Electrophysiology at the Long Island Arrhythmia Center and an Assistant Professor of Medicine at State University of New York, Stony Brook, monitored the functioning of plaintiff's ICD device. (*Id.* at 195.) The ICD device was implanted in plaintiff on December 28, 2003 after he had bypass surgery. (*Id.* at 193.) Dr. Juang's assessments of plaintiff's condition can be gleaned from various letters he sent to other physicians summarizing plaintiff's office visits.

In a May 22, 2007 letter reporting on plaintiff's state to Dr. Cohen, Dr. Juang noted that plaintiff acknowledged that "he is doing well." (*Id.* at 193.) Further, plaintiff "has no shortness of breath or chest pain. He walks one and a half mile on Mondays and Fridays. He has planned to go to Las Vegas early this summer. He has brought [sic] a house there with his brother." (*Id.*) Of his physical examination of plaintiff, Dr. Juang noted that plaintiff "is well nourished and well developed in no apparent distress." (*Id.* at 194.) Dr. Juang further noted that plaintiff's cardiovascular signs were "regular" and "normal," without "murmurs, rubs or heaves." (*Id.*) There was no "claudication, cyanosis or edema" in plaintiff's extremities. (*Id.*) Overall, Dr. Juang summarized that plaintiff "is doing quite well with excellent functioning of his single chamber ICD." (*Id.*)

Plaintiff's next visit to Dr. Juang was on September 6, 2007. (*Id.* at 228.) At the visit, plaintiff told Dr. Juang that "he is walking well. He walks two miles a day. . . . He has no chest pain. He plans to go to Vegas this Christmas. He bought a house there with his brother. He feels more energy with the fish oil and it cleans him out." (*Id.*) Plaintiff exhibited no "claudication, cyanosis, or edema" in his extremities. (*Id.* at 229.) He appeared "well nourished and well developed in no apparent distress." (*Id.*) Plaintiff's heart rhythm was regular and his heart rate was normal. (*Id.*) Overall, Dr. Juang concluded that plaintiff "is doing quite well with excellent functioning of his ICD." (*Id.*)

Dr. Juang's assessments of subsequent visits were very similar. Dr. Juang next saw plaintiff on December 13, 2007. (*Id.* at 225.) Plaintiff reported that "he has recently been dieting. He stopped drinking. He is eating more fruits and vegetables and is feeling [] much better. He plans to be with his family on the holidays and is planning to go to Vegas in February and March 2008." (*Id.*) Dr. Juang noted that plaintiff's heart rate was regular, his heart rhythm was normal, he was "well nourished and well developed in no apparent distress" and did not exhibit "claudication, cyanosis, or edema" in his extremities. (*Id.* at 226.) Overall, Dr. Juang's impression was, once again, that plaintiff was "doing quite well with excellent functioning of his single-chamber ICD. . . . He will most likely require ICD generator exchange next year." (*Id.*)

Dr. Juang evaluated plaintiff again on March 13, 2008. (*Id.* at 220.) Dr. Juang reported that plaintiff "has been feeling well. He has no chest pain or shortness of breath. He walks two miles five times a week." (*Id.*) Although plaintiff had hypertension, his heart rate was regular and his heart rhythm was normal. (*Id.* at 221.) Plaintiff had no "claudication, cyanosis, or edema" in his extremities. (*Id.*) Further, he was "well nourished and well developed in no apparent distress." (*Id.*) Overall, plaintiff was "doing

3

quite well with excellent functioning of his ICD." (*Id.*)

Finally, Dr. Juang evaluated plaintiff on June 10, 2008. (*Id.* at 217.) Dr. Juang noted that plaintiff "has been doing well. He has no chest pains or shortness of breath. He can walk 2 miles five times a week. He went to jury selection last week." (*Id.*) Of his physical evaluation of plaintiff Dr. Juang again noted that plaintiff was "well nourished, well developed in no apparent distress" and his heart rate and rhythm were normal. (*Id.* at 217-18.) Overall, Dr. Juang's impression was that plaintiff was "doing quite well with excellent functioning of his ICD." (*Id.* at 218.)

In the course of these visits, Dr. Juang noted plaintiff's ejection fraction, or the ability of his heart to pump blood, as well as plaintiff's weight. With respect to plaintiff's ejection fraction, Dr. Juang consistently noted that it was twenty percent. (*Id.* at 167, 169, 193, 217, 220, 225, 228.) As described above, Dr. Juang concluded that plaintiff was doing well despite the ejection fraction of twenty percent. Dr. Juang noted plaintiff's weight at various visits in 2007 and 2008. (*See id.* at 168 (253 pounds), 169 (248 pounds), 194 (258 pounds), 217 (264 pounds), 221 (262 pounds), 226 (225 pounds).)

### iii. Dr. Richard H. Smith

Dr. Richard H. Smith, M.D., of Long Island Heart Associates, evaluated plaintiff on October 2, 2008 after Dr. Juang left his practice. (*Id.* at 210.) Dr. Smith concluded that plaintiff's heart rate was regular as was his heart rhythm. (*Id.*) Plaintiff's extremities had "trivial peripheral edema." (*Id.*) Overall, Dr. Smith concluded that plaintiff had "[s]table coronary artery disease, ejection fraction 20%, history of atrial flutter, status post ICD implantation, Class 1-2 heart failure. The patient has a normal functioning ICD . . . ." (*Id.*) Dr. Smith also noted that plaintiff weighed 262 pounds, had a Body Mass Index ("BMI") of 37 and described plaintiff's abdomen as "[s]oft, obese, and nontender." (*Id.*)

### b. Consulting Physician

Dr. W. Wells, M.D., provided a medical opinion on plaintiff's physical condition to the Social Security Administration. He did not personally examine plaintiff, but rather relied on plaintiff's medical records. Dr. Wells evaluated plaintiff's records on July 7 and July 17 of 2007. (*Id.* at 195-98.) In his final assessment, Dr. Wells stated that plaintiff was overweight, but that his overall condition "has improved. RFC [residual functional capacity] stand and walk 6 hrs. per day; lift 10 lbs frequently and 20 lbs occasionally." (*Id.* at 197.) Further, Dr. Wells concluded that plaintiff did not meet any listings for disability under the SSA. (*Id.*) Dr. Wells relied on medical records relating to plaintiff's bypass surgery in 2003 as well as letters from Dr. Juang and Dr. Cohen. (*Id.* at 195, 197.)

### B. Procedural History

This is plaintiff's second application for disability benefits. Plaintiff filed his first application for disability benefits on November 29, 2003. (*Id.* at 26.) In a decision rendered on April 20, 2007, ALJ Michael London (hereinafter "ALJ London") concluded that plaintiff was entitled to disability benefits from November 29, 2003 to November 16, 2005. (*Id.*)

Plaintiff filed his second application for disability benefits on May 28, 2007 claiming disability as of December 1, 2003. (*Id.* at 83.) Plaintiff's application was denied on July 26, 2007. (*Id.* at 45.) On October 1, 2007, plaintiff requested a hearing before an ALJ. (*Id.* at 52.) A hearing was held before ALJ Jay L. Cohen (hereinafter "the ALJ" or "ALJ Cohen") on March 26, 2009. (*Id.* at 32-44.) On April 13, 2009 the ALJ issued a decision denying disability benefits to plaintiff. (*Id.* at 26-31.) Plaintiff appealed the decision to the Appeals Council (*id.* at 5-22), which was denied on October 16, 2009. (*Id.* at 1-3.) Plaintiff then filed this action on December 18, 2009, and the Commissioner served the administrative record and filed his answer on March 18, 2010. The Commissioner moved the Court for a judgment on the pleadings on May 17, 2010. On July 6, 2010, plaintiff responded to the Commissioner's motion and cross-moved for a judgment on the pleadings. The Commissioner responded to plaintiff's motion on August 6, 2010. The motions are fully submitted and the Court has carefully considered the parties' submissions and arguments.

## II. DISCUSSION

### A. Standard of Review

A district court may only set aside a determination by an ALJ that is "based upon legal error" or "not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotations marks omitted)). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### B. The Disability Determination

A claimant is entitled to disability benefits under the SSA if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### C. Analysis

#### 1. The Five-Step Procedure

The ALJ concluded that plaintiff was not disabled under the SSA. As an initial matter, although plaintiff requested disability as of December 1, 2003, the ALJ noted that, in a previous decision rendered on April 20, 2007, plaintiff was determined to be disabled by ALJ London solely from November 29, 2003 until November 16, 2005. (AR at 26.) That decision was not appealed by plaintiff and was thus entitled to *res judicata* effect. As a result, the ALJ considered the application before him as requesting disability benefits as of April 21, 2007, a day after plaintiff's first application for benefits was decided by ALJ London.[3] First, the ALJ concluded that plaintiff was not engaged in substantial gainful employment since April 21, 2007 and was thus not employed at the time of the ALJ's decision. (*Id.* at 28.) Second, the ALJ determined that plaintiff suffered from a severe impairment—namely, a "cardiac

---

3. As noted *supra*, plaintiff does not object to the ALJ's decision to consider plaintiff's request for an onset date as of April 21, 2007.

6

condition"—and that the condition caused more than just a minimal limitation on plaintiff's ability to work. (*Id.*) Third, the ALJ determined that plaintiff did not have an impairment or combination of impairments that "meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526)." (*Id.*) The ALJ noted that the cardiovascular impairments listed in the regulations were considered "in particular" and that overall "the requisite criteria for the relevant listings are absent from the medical record." (*Id.* at 29.) In the fourth and fifth steps of his analysis, the ALJ concluded that plaintiff was unable to perform his past relevant work (*id.* at 30), but that plaintiff had the residual functional capacity to "perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (*Id.* at 29.)

### 2. Residual Functional Capacity to Perform Sedentary Work

Plaintiff asserts that the ALJ failed to address both objective medical evidence and subjective statements from plaintiff that he experienced debilitating leg cramps and muscle aches that affected his residual functional capacity to perform sedentary work. Further, plaintiff argues that the ALJ improperly relied on evidence of plaintiff's daily activities in support of the ALJ's determination that plaintiff has the residual functional capacity to perform sedentary work. The Court concludes that the ALJ carefully evaluated all of the evidence of plaintiff's symptoms and physical abilities. The ALJ's decision that plaintiff had the residual functional capacity to perform sedentary work is supported by substantial evidence on the record.

#### a. Leg Cramps and Muscle Pain

As an initial matter, the Court concludes that the ALJ considered all evidence of plaintiff's symptoms, which included leg cramps and muscle pain. Although the ALJ did not specifically refer to leg cramps and muscle aches in his decision, he noted that he considered all of the evidence presented at the hearing and described his analysis in detail. Specifically, in determining that plaintiff was capable of a full range of sedentary work, the ALJ stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] has also considered opinion evidence." (*Id.* at 29.) The ALJ was not obligated to explicitly reconcile each piece of evidence he considered in his decision as long as it is clear, as is the case here, that he weighed all the evidence of plaintiff's symptoms, both subjective and objective. *See, e.g., Mongeur*, 722 F.2d at 1040 ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.") *Accord Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Despite some inconsistencies in the record with respect to plaintiff's disability, "we are unwilling to require an ALJ explicitly to reconcile every conflicting shred" of evidence.) Not only did the ALJ consider all the evidence of plaintiff's symptoms, but the ALJ's conclusion that plaintiff had the residual functional capacity to perform sedentary work is also supported by substantial evidence despite plaintiff's allegations to the contrary, for the reasons discussed *infra*.

7

i. Objective Medical Evidence

The ALJ's decision that plaintiff had the residual functional capacity for sedentary work is supported by objective medical evidence. The ALJ noted that plaintiff's condition "significantly improved" by 2005, relying on evidence from Dr. Cohen, who monitored plaintiff after his bypass surgery.[4] (AR at 30.) The ALJ also cited to medical evidence suggesting that plaintiff's condition remained stable and much improved after 2005, referring to letters from Dr. Cohen, Dr. Juang and Dr. Smith. (*Id*.) As of March 2007, Dr. Cohen confirmed that plaintiff was asymptomatic. (*Id*.) The ALJ noted that "[t]hroughout the course of treatment with Dr. Juang, out-patient notes indicated that [plaintiff] was doing well with excellent functioning of his ICD." (*Id*.) By October of 2008, Dr. Smith, who took over from Dr. Juang in monitoring plaintiff's ICD implantation, noted that plaintiff was in stable condition with "normal functioning of the ICD." (*Id*.) The ALJ found that plaintiff's subjective description of his symptoms was not credible to the extent that it was inconsistent with the ALJ's determination based on the medical record and other evidence that plaintiff was capable of a full range of sedentary work. (*Id*. at 29.)

Plaintiff points to medical evidence that he experienced leg cramps and muscle pain, which the ALJ allegedly failed to consider. The evidence proffered by plaintiff in his motion papers demonstrates that plaintiff's claim that he did not have the residual functional capacity to perform sedentary work due to leg cramps and muscle pains is unavailing. Plaintiff refers to evidence from Dr. Cohen which indicates that plaintiff complained of leg cramps in 2006. (Pl.'s Cross-Mot. Mem. of Law at 11.) As an initial matter, the ALJ was considering plaintiff's disability as of April 21, 2007, much later than the letter on which plaintiff relies. In any event, plaintiff himself points out that Dr. Cohen concluded that the cramps were due to plaintiff's use of the Lipitor medication and that one month after being switched from Lipitor to another drug, plaintiff's "leg cramps resolved." (*Id*.) Dr. Cohen's letter from 2007 noted that plaintiff did not suffer from edema in his extremities. Dr. Cohen's 2007 letter did not mention any

---

4. The ALJ described Dr. Cohen's letter as indicating that plaintiff's ejection fraction improved to fifty-five or sixty percent by 2005 and concluded that plaintiff's ejection fraction "has returned to normal." (AR at 30.) The Court notes that Dr. Juang's letters from 2007 and 2008 state that plaintiff's ejection fraction was twenty percent. (*Id*. at 167, 169, 193, 217, 220, 225, 228.) Dr. Smith's 2008 letter also notes that plaintiff's ejection fraction was twenty percent. (*Id*. at 210.) Although plaintiff does not directly rely on low ejection fraction in his papers to support his argument that he is disabled, plaintiff argues that the ALJ failed to evaluate plaintiff's fatigue. (Pl.'s Reply at 2.) Plaintiff's fatigue was presumably caused by low ejection fraction. As noted above, the ALJ considered all evidence of plaintiff's symptoms. To the extent the ALJ may have mistakenly concluded that plaintiff's ejection fraction was higher than it actually was, his determination that plaintiff was not disabled is nevertheless based on substantial medical and testimonial evidence on record. Letters by Dr. Juang and Dr. Smith that were clearly considered by the ALJ indicated that plaintiff was doing very well despite an ejection fraction of twenty percent. Further, plaintiff himself testified that he was able to work an eight-hour work day right after stating that he experienced fatigue as a symptom of his allegedly disabling condition. (AR at 43.) As discussed in more detail *infra*, there is substantial evidence to support the ALJ's conclusion that plaintiff was not disabled as of April 21, 2007.

8

complaints by plaintiff of leg cramps or muscle pains. (*Id.* at 231.) Plaintiff does not refer to other medical evidence indicating that plaintiff continued to experience leg cramps or muscle pain. Plaintiff relies on a 2008 letter from Dr. Juang, which suggested that plaintiff might have to switch to yet another cholesterol-controlling drug (*id.*), but it is unclear if plaintiff was actually experiencing leg cramps at this point. The letters from Dr. Juang in 2007 and 2008 clearly indicate that plaintiff did not suffer from edema and there are no reports whatsoever of any complaints by plaintiff of leg cramps. Further, plaintiff's reliance on Dr. Smith's letter is misplaced because Dr. Smith noted that evidence of edema in plaintiff's extremities was "trivial." (*Id.*)

Thus, the objective medical evidence supports the ALJ's conclusion that plaintiff had the residual functional capacity to perform sedentary work and that plaintiff was not limited by leg cramps or muscle pain.

ii. Subjective Testimony

It is clear that the ALJ considered plaintiff's testimony about his leg cramps and muscle pain, as noted above, despite plaintiff's allegations to the contrary. The ALJ ultimately concluded this testimony was not credible in light of plaintiff's testimony that he was able to perform sedentary work and in light of objective medical evidence. Although plaintiff testified that he experienced cramps that prevented him from sitting for more than an hour, standing for more than an hour and walking for more than fifteen minutes (AR at 38-39), plaintiff also testified that he was capable of performing sedentary work. During the hearing, the ALJ asked plaintiff if his heart condition prevented him from "rightfully doing like a sitting job, like a security job like the gentleman does out here in the waiting room[,]" to which plaintiff responded no, "not right now." (*Id.* at 42.) In fact, plaintiff was asked for a second time whether there is "anything about [his] heart condition that would prevent [him] from" working an "eight-hour day," to which he replied "I don't think so."[5] (*Id.* at 43.) Further, when asked why he was not working, plaintiff responded that it was because he was taking care of his father, rather than because he was unable to do so based on a disability. (*Id.*) The ALJ was in the best position to assess the credibility of plaintiff's testimony about his leg cramps

---

5. Plaintiff asserts that the ALJ failed to advise plaintiff "about the demands of that [sedentary] job or question[] [him] about the number of breaks he might need throughout the workday." (Pl.'s Cross-Mot. Mem. of Law at 12.) However, it is unclear why the ALJ would have to ask these questions in light of plaintiff's testimony. The ALJ asked plaintiff a broad question whether there is *anything* about his condition that would prevent him from working an eight-hour workday—for example, his need to take a certain number of breaks. Plaintiff never mentioned leg cramps in his answer to the ALJ's broad question. Further, it is not the case that there is "uncontradicted testimonial evidence regarding [plaintiff's] limited sitting ability due to leg cramps and medical evidence supporting the existence of the same." (*Id.* at 13.) As the Court described above, medical evidence from plaintiff's own treating physicians noted time after time that in 2007 and 2008 plaintiff was not suffering from edema of his extremities and no mention was made of any complaints of leg cramps or muscle pain by plaintiff to his physicians during appointments. The ALJ was in the best position to assess plaintiff's credibility to the extent plaintiff's testimony contradicted the findings of his doctors.

9

and muscle pain in light of plaintiff's testimony that he could perform sedentary work and in light of the objective medical evidence about plaintiff's physical condition. Thus, the Court concludes that there is substantial evidence (including portions of plaintiff's own testimony) that plaintiff was not disabled and could perform sedentary work.

### b. Daily Activities

Plaintiff asserts that there is no evidence why his daily activities, including walking and taking care of his father, are consistent with a finding that plaintiff can perform sedentary work. (Pl.'s Cross-Mot. Mem. of Law at 17.) Essentially, plaintiff argues that any evidence related to his ability to walk a certain amount per day or his activities in taking care of his father (including cooking and dressing him) have nothing to do with plaintiff's ability to perform a sitting job. In his decision, the ALJ noted that plaintiff "remains able to walk up to two miles five times weekly" and "is able to care for the needs of his father." (AR at 30.) Evidence of plaintiff's daily activities is relevant to his overall ability to function in a work setting and the ALJ's determination of plaintiff's credibility in testifying about the severity of his leg cramps in preventing plaintiff from walking or sitting. In any event, as the Court described *supra*, there is substantial evidence to support the ALJ's conclusion that plaintiff had the residual functional capacity to perform sedentary work.

* * *

In sum, there is substantial evidence to support the ALJ's conclusion that plaintiff had the residual functional capacity to perform sedentary work. The letters from plaintiff's treating physicians, along with plaintiff's own testimony, support the ALJ's conclusion that plaintiff did not experience edema in his extremities and did not suffer from debilitating leg cramps and muscle pain that would prevent him from performing sedentary work. Evidence of plaintiff's daily activities also are consistent with the ALJ's conclusion that plaintiff was not disabled.

### 3. Severe Combination of Impairments

Plaintiff alleges that the ALJ did not consider substantial evidence that plaintiff had a severe combination of impairments based on the effect of obesity in combination with plaintiff's heart condition.[6] Plaintiff has failed to satisfy his burden of proving that he has a severe combination of impairments that cause him to be disabled.

An impairment or combination of impairments is "severe" if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46. An impairment or combination of impairments is "not severe" when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to basic work activities. *See* 20 C.F.R. §

---

6. Plaintiff testified that he also suffered from back problems—namely, curvature of the spine and sprained muscles. (AR at 40.) Plaintiff testified that he had been seeing a chiropractor for these conditions prior to his bypass surgery in 2003, but had not been going lately. (*Id.*) Plaintiff's briefs to the Court make no mention of the role of this alleged condition. In any event, there is substantial evidence to support the ALJ's conclusion that plaintiff was not disabled as of April 21, 2007.

404.1521 (listing examples of basic work activities). The claimant bears the burden of proving he has a severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Furthermore, if the court finds that there is substantial evidence to support the ALJ's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *See Yancey*, 145 F.3d at 111; *Jones*, 949 F.2d at 59.

Aside from objective medical facts, the ALJ must consider subjective evidence of pain and disability in his "severity" analysis, *see Mongeur*, 722 F.2d at 1037, including evidence from non-medical sources such as statements or reports from the claimant and testimony from relatives. *See* 20 C.F.R. §§ 404.1529(a), 404.1513(d). Subjective symptoms, however, are insufficient to establish a person's disability under the SSA unless there are medical signs and laboratory findings showing that a medical impairment could reasonably be causing the pain or other symptoms. S.S.R. 96-7p; *see also* 20 C.F.R. §§ 404.1529(d)(1), 416.929(d)(1). Additionally, when a claimant's statements about his pain and disability suggest a greater severity of impairment than the objective medical evidence shows by itself, the Commissioner considers relevant factors such as the following: the claimant's daily activities; the nature, location, onset, duration, frequency, and intensity of pain; factors that precipitate or aggravate claimant's pain or disability; the type, dosage, effectiveness, and side effects of medication taken; any other treatment; and any other measures the claimant used torelieve pain or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); S.S.R. 96-7p.

Plaintiff asserts that the ALJ failed to consider whether plaintiff's obesity, in combination with his heart condition, caused him to be disabled. (Pl.'s Cross-Mot. Mem. of Law at 14-16.) Plaintiff is wrong. For the reasons set forth below, the Court concludes that the ALJ carefully and fully considered all the evidence, provided detailed explanations for his findings, and relied on substantial evidence to support his conclusion that plaintiff was not disabled. The ALJ's conclusion that plaintiff's weight, in combination with his heart condition, did not cause plaintiff to be disabled is supported by substantial evidence.

As an initial matter, the Court notes that plaintiff was not claiming disability based on any effects of being obese. In his application for disability benefits, plaintiff asserted that the illness, injury or condition limiting his ability to work is his "[t]riple bypass surgery with pacemaker & heart damage." (AR at 76.) Further, in his pre-hearing brief to the ALJ outlining the basis for plaintiff's disability claim, plaintiff indicated that his "physical disability is directly correlated to the following conditions: [c]ongestive heart failure accompanied by pulmonary edema, status-post unsuccessful triple bypass surgery." (*Id*. at 111.) During his hearing, the ALJ described plaintiff's application for disability as being based on his "heart condition, as a result of the operation, and its lingering symptoms." (*Id*. at 43.) Plaintiff did not object to this statement and not once mentioned his weight as a factor limiting his ability to work.

Even though plaintiff's disability application clearly was not based on any effect his weight was having on his ability to work, the ALJ was nevertheless aware of plaintiff's weight and took it into consideration when evaluating the impairments or combination of impairments that could cause plaintiff to be disabled. In

11

his decision, the ALJ concluded that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ." (*Id*. at 28.) Although the ALJ considered the listed cardiovascular impairment "in particular," as that was clearly the basis for plaintiff's claim for disability, it is also apparent that he considered the other listed criteria and combination of criteria. The ALJ also noted that in concluding that plaintiff had the residual functional capacity to perform the full range of sedentary work he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id*. at 29.) The ALJ was aware of plaintiff's weight, which had been consistently mentioned throughout the record, including letters by Dr. Juang and Dr. Smith that were described and relied upon in the ALJ's decision.[7] (*See id*. at 168, 169, 194, 210, 217, 221, 226.) Based on the ALJ's decision, it is clear that he adopted the physical limitations delineated in the medical record, which clearly referenced plaintiff's weight.

Further, as described *supra* there is substantial evidence to support the ALJ's conclusion that plaintiff is not disabled. Plaintiff's testimony along with objective medical evidence from his treating physicians support the ALJ's conclusion that plaintiff was doing well as of his proposed onset date of April 21, 2007 and, as plaintiff himself indicated, was capable of working an eight-hour workday. *See supra* Section II.C.2. In short, the Court concludes that the ALJ was aware of and took into account medical evidence of plaintiff's weight even though plaintiff made no mention of it anywhere in his papers or in his testimony, and properly concluded, based on substantial evidence, that plaintiff was not disabled. *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("We follow the Seventh Circuit and conclude that a remand is not required here because it would not affect the outcome of the case. Rutherford never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments. So even if we assume--in accordance with common sense--that the administrative record's evidence of Rutherford's . . . height and her weight of some 245 pounds sufficed to alert the ALJ that obesity could be a factor, Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments.") *Cf. Guadalupe v. Barnhart*, No. 04 CV 7644 HB, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (though plaintiff testified about her fluctuating weight and the ALJ noted her height and weight in his decision, the court concluded that "[w]hen an ALJ's decision adopts the physical limitations suggested by reviewing doctors after

---

7. The ALJ was also aware of plaintiff's height, which is relevant to the determination of plaintiff's Body Mass Index ("BMI"). (AR at 75 (height without shoes is five feet eleven inches), 149-52, 155-57.) Also, Dr. Smith's letter indicated that plaintiff's BMI was 37 at the time of the visit. (*Id*. at 210.) BMI is, aside from weight, another method of determining whether plaintiff is obese for purposes of his disability determination. *See* S.S.R. 02-1p.

examining the Plaintiff, the claimant's obesity is understood to have been factored into their decision. . . . The ALJ's decision sufficiently, if somewhat indirectly, accounted for Plaintiff's obesity and determined that it did not impose a functional limitation on light work." (citations omitted)).

\* \* \*

In sum, based upon a careful review of the administrative record, the Court concludes that the ALJ properly considered all of the evidence and explained in detail the basis for his findings. There is substantial evidence to support the ALJ's conclusion that plaintiff was not disabled as of April 21, 2007. The ALJ considered plaintiff's weight and based his decision that plaintiff did not have a severe combination of impairments on findings of plaintiff's treating physicians that listed plaintiff's weight. There is substantial evidence to support the ALJ's conclusion that plaintiff had the residual functional capacity to perform sedentary work despite his testimony that he experienced leg cramps and muscle pain. Finally, the ALJ was in the best position to weigh plaintiff's testimony about his daily activities in light of objective medical evidence about plaintiff's ability to perform sedentary work and plaintiff's own testimony that he could perform a sedentary job.

### III. CONCLUSION

For the reasons stated above, defendant's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is granted and plaintiff's motion for judgment on the pleadings is denied. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 24, 2011
       Central Islip, New York

\* \* \*

The attorney for plaintiff is Christopher James Bowes, Esq., 54 Cobblestone Drive, Shoreham, New York, 11786. The attorney for defendant is Loretta E. Lynch, United States Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York, 11722.

13